1  DAVID R. ZARO (BAR NO. 124334)
   JOSHUA A. DEL CASTILLO (BAR NO. 239015)
2  KENYON HARBISON (BAR NO. 260416)
   ALLEN MATKINS LECK GAMBLE
3    MALLORY & NATSIS LLP
   515 South Figueroa Street, Ninth Floor
4  Los Angeles, California 90071-3309
   Phone: (213) 622-5555
5  Fax: (213) 620-8816
   E-Mail:dzaro@allenmatkins.com
6        jdelcastillo@allenmatkins.com
         kharbison@allenmatkins.com
7
   [Proposed] Attorneys for Receiver
8  KRISTEN A. JANULEWICZ

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12 SECURITIES AND EXCHANGE              Case No. 15-cv-226 BAS (DHB)
   COMMISSION,
13                                      NO ORAL ARGUMENT UNLESS
             Plaintiff,                 REQUESTED BY THE COURT
14
                                        **INITIAL REPORT AND**
15     v.                               **RECOMMENDATIONS AND**
                                        **PETITION FOR INSTRUCTIONS OF**
16                                      **RECEIVER, KRISTEN A.**
   TOTAL WEALTH MANAGEMENT,             **JANULEWICZ**
17 INC.; et al.,
                                        [Notice of Filing of First Interim Report;
18           Defendants.                and [Proposed] Order submitted
                                        concurrently herewith]
19
                                        Date:   April 20, 2015
20                                      Judge:  Hon. Cynthia Bashant

21

22

23     **TO ALL PARTIES, THEIR COUNSEL OF RECORD, AND THIS**

24 **HONORABLE COURT:**

25        In accordance with: (a) this Court's October 4, 2015 "Stipulation and

26 Temporary Restraining Order and Orders (1) Freezing Assets; (2) Prohibiting the

27 Destruction of Documents; (3) Granting Expedited Discovery; (4) Requiring

28 Accountings; (5) Appointing a Temporary Receiver, and Order to Show Cause Re

1010627.04/LA

Preliminary Injunction and Appointment of Permanent Receiver" [the "TRO"]; (b) the Court's October 12, 2015 "(1) Preliminary Injunction, Appointment of a Permanent Receiver, and Related Orders; and (2) Order Vacating Hearing on Preliminary Injunction" [the "Permanent Appointment Order"]; and (c) Civil Local Rule 66.1(e), Kristen A. Janulewicz (the "Receiver"), the Court-appointed permanent receiver for Total Wealth Management, Inc. ("Total Wealth"), and its subsidiaries and affiliates, including but not limited to Altus Capital Management, LLC (collectively, the "Receivership Entities" or "Entities"), hereby submits the following Initial Report and Recommendations and Petition for Instructions of Receiver ("Report"):

I.    **EXECUTIVE SUMMARY.**

As detailed below, the Receiver has made substantial progress in her investigation of the business and financial activities of the Receivership Entities, as well as her effort to recover the assets of the Receivership Entities ("Receivership Assets"). While her efforts are incomplete, the materials recovered and reviewed to date lend themselves to a number of preliminary conclusions[1] and observations, including:

- Total Wealth and a consulting company owned and operated by Defendant Jacob Cooper received revenue sharing, management, and other fees, including fees paid by funds in which the Entities were invested, a number of which appear to have been losing money or insolvent, and others of whom had unusual affiliations with the Receivership Entities and Mr. Cooper.

---

[1]    Due to the volume and nature of the information acquired to date, the nature and complexity of the matters and transactions analyzed by the Receiver and her professionals, and the need for significant additional work, this Report is preliminary. The Receiver may need to materially modify the conclusions presented herein after further investigation and administration of the present receivership estate.

LAW OFFICES
atkins Leck Gamble

- At least one Entity appears to have overstated investor balances in order to charge excessive management fees, calculated as a percentage of monthly closing balances.

- The Entities hold investments reportedly valued approximately in excess of $30 million in Private Placement Capital Notes II, LLC ("PPCN"), an entity with limited resources and holdings which do not appear to have been sufficient to generate the substantial interest payments made by the entity, including interests payments made in cash. To date, no rationale for such an extraordinary concentration of investment funds in a single entity with few cognizable assets has been provided. The Receiver is pursuing discovery with regard to PPCN.

- The degree to which the individual Receivership Entity funds were diversified was substantially overstated, and investors were placed into funds holding substantially similar investments, regardless of investment goals or preferences. In other words, many of the Entities invested in the exact same things, notwithstanding their stated differing investment goals and objectives.

- At least $3.2 million in investor funds were directed to a coffee franchise operator in San Francisco which appears to have been insolvent since its inception. It is now in bankruptcy and seeking to sell its assets for an amount that is approximately 14% of the amount invested.

- The Receivership Entities passed on so-called operating expenses to investors, which expenses included approximately $300,000 in legal fees incurred to defend the Entities and their principal in litigation brought by aggrieved investors, as well as accounting fees and other operating expenses of Total Wealth.

LAW OFFICES
atkins Leck Gamble

- The Entities' investments were subject to substantial losses. The records recovered to date suggest that Entity investors suffered substantial losses in the pre-receivership period and that current investors may face additional, future losses of as much as $44 million.

As reflected in the Court's record, the Receiver has been vested with the full powers of an equity receiver, including, but not limited to, full power over all funds, assets, collateral, premises (whether owned, leased, occupied or otherwise controlled), choses in action, books, records, papers and other property belonging to, being managed by or in the possession of or control of the Receivership Entities ("Receivership Assets"), and was immediately authorized, empowered and directed to, among other things: (1) take exclusive authority and control over all Receivership Assets; (2) conduct such investigation and discovery as necessary to identify and locate outstanding Receivership Assets; (3) preserve and prevent the dissipation of Receivership Assets; and (4) provide an accounting to the Court and plaintiff Securities and Exchange Commission (the "Commission") regarding the business and financial activities of the Receivership Entities.

The Receiver and her proposed counsel of record, Allen Matkins Leck Gamble Mallory & Natsis LLP ("Allen Matkins"), have diligently pursued these goals since the February 4, 2015 inception of the receivership, and the Receiver's efforts, analysis, preliminary conclusions, and recommendations are presented, in detail, below.

## II. PROCEDURAL HISTORY.

The Court and any interested parties are directed to the following materials[2] for a general summary of the relevant facts underlying the above-captioned case and the activities of the Receiver and her professionals:

---

[2] Materials are available on the Receiver's website, totalwealthreceiver.com.

LAW OFFICES
atkins Leck Gamble

- Commission's Complaint (the "SEC Complaint") against Defendants Total Wealth and Jacob Keith Cooper (Docket No. 1.);
- Commission's Ex Parte Application for Temporary Restraining Order and Other Relief (Docket No. 2.);
- TRO (Docket No. 5);
- Commission's Memorandum of Points and Authorities in Support of Preliminary Injunction and Appointment of Permanent Receiver (Docket No. 6); and
- Permanent Appointment Order (Docket No. 8).

## III. RECEIVER'S ACTIVITIES AND EFFORTS SINCE INCEPTION OF RECEIVERSHIP.

### A. Assertion Of Jurisdiction.

The territorial jurisdiction of this Court – and thus of the Receiver – is extended to any district of the United States where Receivership Assets are believed to be located. 28 U.S.C. § 754; see also Haile v. Henderson Nat'l Bank, 657 F.2d 816, 822 (6th Cir. 1981). Based on information obtained by the Receiver since her appointment, the Receiver has filed and registered the SEC Complaint and TRO in United States District Courts in Colorado, Delaware, Kansas, Nevada, New York, Utah, and Virginia, along with all California District Courts, in conformity with 28 U.S.C. § 754 and applicable federal law. Registration of the Permanent Appointment Order is underway in each of these districts. As additional Receivership Assets are located, the Receiver may file/register the SEC Complaint and Permanent Appointment Order in other districts as well.

### B. Marshaling And Preserving Receivership Assets.

Immediately upon her appointment, the Receiver caused Allen Matkins to send formal notice of the instant receivership (and the asset control and turn-over provisions of the TRO and Permanent Appointment Orders) to all entities and individuals presently believed to be in possession of Receivership Assets, whether in

LAW OFFICES
atkins Leck Gamble

1   the form of hard assets (money or investments) or books and records, as in the case

2   of the Receivership Entities' pre-receivership attorneys, accountants, and other

3   professionals.  As of the date of this Report, Allen Matkins has sent nearly 50

4   formal notices and requests for turn-over of Receivership Assets, including books

5   and records.  The Receiver and Allen Matkins are presently working with all

6   recipients who have responded to these requests to coordinate the turn-over and to

7   address any issues that have arisen as a consequence of the Receiver's appointment.

8           Pre-receivership counsel for the Entities have also turned their files over to

9   the Receiver, and, as further detailed below, the Receiver has secured access to the

10  bulk of the Receivership Entities' records, presently maintained by a number of

11  cloud service providers.  Likewise, the Receiver has recovered numerous bank and

12  accounting records relating to the business and financial activities of the

13  Receivership Entities.  All records recovered to date are presently under review by

14  the Receiver and the Receiver's preliminary conclusions and recommendations from

15  her document review and analysis are presented below.

16          With respect to cash assets, and as of the date of this Report, the Receiver has

17  assumed authority and control over approximately $2 million in cash, including in

18  Entity bank accounts, and anticipates the near-term turn-over of an additional

19  $150,000 from the Commission (apparently paid by Defendant Cooper to the

20  Commission in connection with its pre-receivership administrative action out of

21  Receivership Assets), along with approximately $14,000 turned over by pre-

22  receivership counsel.  Cash recoveries, including anticipated near-term recoveries,

23  presently total approximately $2,154,603.  The Receiver's preliminary estimate of

24  the Altus Funds investments, including the cash on hand, is appended as **Exhibit 1**

25  hereto.

26          In addition to affirmatively recovering Receivership Assets, the Receiver has

27  also endeavored to protect the estate of the Receivership Entities from diminution,

28  including via the notice to parties believed to be in possession of Receivership

LAW OFFICES
atkins Leck Gamble

Assets (of whatever form) of the receivership, as well as filing formal Notices of Pending Receivership in all known federal and state actions where the Receivership Entities are Defendants.[3]

## C. Investigation And Discovery.

### 1. Site Visit.

At the time TRO was entered, the Receiver was informed that the Receivership Entities maintained a physical office located at 8880 Rio San Diego Drive, Suite 800, San Diego, California (the "Site"). Shortly after the entry of the TRO, the Receiver and her staff visited the Site, only to learn from Premier Business Centers ("Premier"), an executive suites-type property operator, that the Entities had abandoned their executive suite at the Site, unannounced, in late 2014, with multiple months of rent due and owing. No Receivership Entity books, records, or computers were located at the Site.

In her discussions with Premier, the Receiver learned that, in the period between the Entities' abandonment of the Site and the Appointment of the Receiver, all Entity mail was being collected by one of the Receivership Entities' principals, Douglas Shoemaker, who also apparently maintains an office at the Site. The Receiver has arranged for all future mail received at the Site and addressed to the Entities is delivered to her, and has advised Mr. Shoemaker of the receivership, and made a demand to him for books and records. Mr. Shoemaker is accordingly obligated to turn-over any Receivership Assets in his possession to the Receiver although, as of the date of this Report, he has not produced any materials.

---

[3] These actions include: (1) Mitchell v. Total Wealth Management, Inc., USDC, SD Cal., Case No. 14 cv-1552-GPC-JLB; (2) Staniforth v. Total Wealth Management, Inc., USDC, SD Cal. Case No. 14 cv-1899-GPC-JLB; (3) Calderon v. Total Wealth Management, Inc., San Diego County Superior Court Case No. 37-2014-00015682-CU-SL-CTL; and (4) Troya v. Total Wealth Management, Inc., San Diego County Superior Court Case No. 37-2014-00012816-CU-PN-CTL.

Case No. 15-cv-226 BAS (DHB)

LAW OFFICES
atkins Leck Gamble

## 2. Document Recovery and Review.

### (a) Summary of Receiver's Document Recovery Efforts.

As noted above, the Receivership Entities left no books, records, or computers behind at the Site. Accordingly, the Receiver has had to secure Receivership Entity books and records from other sources, including via direct turn-over demands, document subpoenas, and informal requests. As of the date of this Report, the Receiver has, through Allen Matkins, delivered nearly 50 formal notices of the Receiver's appointment, along with turn-over requests for Receivership Assets, and served a total of 22 document subpoenas on third parties believed to be in possession of Receivership Assets, including books and records necessary to the Receiver's accounting and analysis. In addition, the Receiver's office has directly contacted more than 50 entities believed to have information relevant to the receivership case.

### (b) Digital and Computer Records of the Receivership Entities.

In an informal interview with Defendant Cooper, Defendant Cooper confirmed to the Receiver that it was the Entities' policy and practice not to keep physical records, but to cause all documents to be scanned and uploaded to cloud storage, administered by the service provider commonly known as "Box.net" or "Box.com" ("Box"). Mr. Cooper also provided the Receiver with information relating to entities that administered the Receivership Entities' email accounts.

Mr. Cooper has since provided the Receiver with his Box login credentials, along with a proxy, Receiver-specific login account. Thereafter, the Receiver accessed the Entities' Box records, and coordinated with Box to ensure that, in accordance with the terms of the TRO and Permanent Appointment Order, access to parties other than the Receiver and her professionals was blocked. The Box cloud storage contains thousands of pages of Entity records.

LAW OFFICES
atkins Leck Gamble

1   After her interview with Mr. Cooper, the Receiver notified relevant email and
2   other digital service providers of the pending receivership, and requested access to
3   all email and other digital records.  The service providers contacted to date have
4   committed to cooperating with the Receiver and have begun providing requested
5   access and records.

6       Finally, the Receiver has also sought to obtain forensic images of any
7   Receivership Entity or Entity principal/employee computers or digital devices
8   containing Entity records.  As of the date of this Report, Mr. Cooper, the Entities'
9   principal, and Britany Fowler, who previously served as Total Wealth's operations
10  manager, have delivered their computers for imaging.  The Receiver is informed,
11  however, that Ms. Fowler also maintains a computer owned by her current
12  employer, Elevage Partners, LLC ("Elevage"), a Registered Investment Adviser to
13  whom a substantial number of Entity investor accounts were recently transferred,
14  which may contain Receivership Entity records.  While Elevage has indicated its
15  willingness to allow the Receiver limited access to this computer, it has not, as of
16  the date of this Report, finalized the conditions under which it will allow access.

17              *(c)    Accounting and Professional Records of the Receivership*
18                      *Entities.*

19      The Receiver has also contacted Mark Dionne, of So. Cal Tax, and David
20  Barton of Abaco FSC, Ltd. ("Abaco"), each of whom provided accounting services
21  to the Receivership Entities and is cooperating with the Receiver.  Mr. Dionne has
22  provided the Receiver with his "QuickBooks" accounting records for the Entities, as
23  well as direct access to an Entity-specific accounting system, FundCount, which Mr.
24  Dionne used exclusively in connection with the services he performed for the
25  Entities.  Abaco has likewise provided the Receiver with documents relating to the
26  services it performed.

27      As noted above, the Receiver has also received client files from the Sparer
28  Law Group, a San Francisco law firm representing certain Receivership Entities in

LAW OFFICES
atkins Leck Gamble

1  pre-receivership litigation in both state and federal court.  The Receiver has also

2  made a client file demand to Paul Manasian, whom the Receiver believes

3  represented Altus Capital Management, LLC as counsel in connection with a

4  number of loans made to Aegis Holding Company, Inc., the parent company of

5  Metropolitan Coffee and Concession, LLC ("Metro Coffee"), an entity into which

6  substantial Receivership Entity investor funds were directed.  Attorney Manasian

7  has not yet produced documents the Receiver.

8              (d)      *Banking and Other Receivership Entity Financial*

9                       *Materials.*

10      In addition to the Receivership Entities' own records, their accounting

11  records, and records produced by counsel, the Receiver has also recovered banking

12  and other financial materials from a variety of third party sources, including from

13  bankruptcy counsel for Metro Coffee[4], third party service providers, and others.

14              3.      Third Party Interviews.

15      In addition to requesting documents from parties believed to have conducted

16  business with or performed services for the Receivership Entities, the Receiver has

17  also conducted a number of informal interviews with some of the Entities' principals

18  and employees, and principals and employees of affiliated or associated entities.

19  Most significant among these interviews were:

20              (a)      *Defendant Cooper.*

21      Shortly after her appointment pursuant to the TRO, the Receiver conducted a

22  telephonic interview of Mr. Cooper, largely aimed at securing necessary Entity

23  documents and records, but which also addressed issues ranging from the

24  identification of Entity service providers to the manner in which the Entities

25  communicated with investors and the scope and nature of some of the investments

26  presently believed to fall within the ambit of the Permanent Appointment Order.

27  _____

28  [4]  In re Metropolitan Coffee and Concession Company, LLC, USBC, N.D. Cal.
    Case No. 14-44242.

LAW OFFICES
atkins Leck Gamble

1  While Mr. Cooper was cooperative in providing the Receiver with access to Entity
2  records, he did not provide any meaningful or specific information regarding the
3  operations of the Receivership Entities.

                *(b)*    *Britany Fowler.*

5         Again, Ms. Fowler previously served as the operations manager for Total
6  Wealth.  The Receiver conducted a series of telephonic interviews with Ms. Fowler
7  in which Ms. Fowler provided valuable information relating to the operation of the
8  Receivership Entities, as well as their business and financial activities in recent
9  months.  Specifically, Ms. Fowler represented to the Receiver that, in early January
10  2014, Mr. Cooper had commenced winding down the Altus Funds[5], submitting
11  liquidations requests to various other funds in which the Altus Funds had invested.
12  The records obtained by the Receiver seem to confirm this, and reflect that, between
13  July 2014 and January 2015, the Altus Funds received more than $5 million in
14  liquidations and, inclusive of previous liquidation amounts received, made more
15  than $6 million in distributions to investors.  Ms. Fowler further advised that some
16  liquidating funds had outstanding "hold-backs" (cash not yet released to the Altus
17  Funds) and the Receiver's records reflect approximately $4 million in outstanding
18  holdbacks or pending liquidations.

19         In addition, Ms. Fowler represented that, in May and July 2014, the
20  Receivership Entities had written off as bad debt a total of nearly $18 million in
21  investments into Aegis Atlantic and Aegis Retail, affiliates of Aegis Holding
22  Company, Inc., the parent of Metro Coffee.  The documents recovered by the
23  Receiver as of the date of this Report indicate that these funds were used to open

---

26  [5]  The Altus Funds, which are Receivership Entities as a consequence of their
common control by and affiliation with Total Wealth and Altus Capital
27  Management, LLC, include Altus Focused Growth Portfolio Series, LP; Altus
Income Portfolio Series, LP; Altus Conservative Portfolio Series, LP; Altus
28  Moderate Growth Portfolio Series, LP; Altus Moderate Portfolio Series, LP;
Altus Growth Portfolio Series, LP; and Altus Capital Opportunity Fund, LP.

Case No.  15-cv-226 BAS (DHB)

1010627.04/LA

LAW OFFICES
atkins Leck Gamble

1  and operate two restaurants in New York, both of which are closed and whose

2  leasehold improvements and inventories appear to be lost.

3      Finally, Ms. Fowler provided some information regarding Private Placement

4  Capital Notes II, LLC ("PPCN"), an entity into which approximately $30 million in

5  investor funds was directed.  While Ms. Fowler was unable to describe the nature of

6  the PPCN investment, she did relay that PPCN issued notes to the Receivership

7  Entities, held for the benefit of investors, and had refused to re-title (assign) those

8  notes at the request of investors who had moved their portfolios to Elevage,

9  claiming that such an assignment would violate the federal securities laws.

10              *(c)    Tony Hartman / PPCN.*

11      Mr. Hartman is a principal and manager of PPCN.  PPCN purported to use the

12  money invested through the Altus Funds for bridge loans, the operation and

13  management of a resort located in South Carolina and a mining start-up located in

14  Utah.  While Mr. Hartman consented to an interview, and provided the Receiver

15  with a general overview of the purported nature of the PPCN investments, neither he

16  nor PPCN have produced any documents in response to the Receiver's requests.

17      Mr. Hartman represented to the Receiver that PPCN's resort and mining

18  enterprise reflected its principal holdings, and that the notes issued to the Altus

19  Funds represent over 50% of the investment in PPCN.  PPCN's other assets appear

20  to be limited, comprised of a number of relatively small bridge loans with an

21  aggregate investment value of approximately $2 million.  Mr. Hartman claimed that

22  the notes issued by PPCN to the Altus Funds are unsecured, and must be held for at

23  least 5 years before a redemption request can be fulfilled.

24      While PPCN has yet to produce documents to the Receiver, materials and

25  information obtained from other sources give rise to important questions regarding

26  the viability of the PPCN investments, as addressed in greater detail below.

27

28

1010627.04/LA

LAW OFFICES
atkins Leck Gamble

## D. Preliminary Accounting And Inventory Efforts.

Based on her review of the records recovered to date, the Receiver has been able to draw some preliminary conclusions regarding the business and financial activities of the Receivership Entities, as well as their relationship to one another, and to prepare a preliminary accounting and inventory of Receivership Assets on-hand, a copy of which is attached hereto as **Exhibit 1**.

## IV. RECEIVER'S PRELIMINARY CONCLUSIONS AND OBSERVATIONS.

While the Receiver's document recovery, review, and analysis efforts remain incomplete, the Receiver has conducted sufficient review and analysis of the materials recovered to date to present some preliminary conclusions and observations regarding the business and financial activities of the Receivership Entities.

### A. Receipt Of Revenue Sharing Fees.

The records obtained by the Receiver to date suggest that, in addition to receiving advisory fees from the Altus Funds, Total Wealth was receiving revenue sharing fees from a number of the underlying funds in which the Altus Funds were invested. Notable among Total Wealth's receipt of revenue sharing fees are;

- $124,242 paid by Aegis Retail Group from 2011 through 2012;
- $106,879 paid by LJL Funding, an investment common to many or all of the Altus Funds, from 2010 through 2012;
- $349,383 paid by PPCN from 2012 through 2014; and
- $198,890 paid by Rainmaker Capital, an investment common to many or all of the Altus Funds, from 2009 through 2014.

The Aegis Retail Group payment is unusual, given that the Receiver's records reflect that the Aegis entities had substantial losses and were essentially insolvent during all relevant periods, meaning the fees paid could otherwise have mitigated investors' losses. The same is true for the LJL payment, as the Receiver's records

LAW OFFICES
atkins Leck Gamble

reflect that at least one LJL entity, LJL Secured High Yield Income Fund 1, LLC, made revenue sharing payments when its investors had lost 20% to 50% of their investments. Finally, and as detailed below, the fees paid by PPCN are particularly interesting, given the existence of an unusual relationship between PPCN and the Receivership Entities.

Total Wealth appears to have received a total of approximately $1.3 million in revenue sharing fees from October 2009 through September 2014. Approximately $1 million of this amount was later paid by Total Wealth to Pinnacle Wealth Group, Inc. ("Pinnacle"), Defendant Cooper's personal consulting company. Pinnacle also received approximately $415,000 in "solicitor fee revenue" from Denver Financial Group, Inc. ("DFG"), an entity controlled by Tony Hartman, who controls PPCN.

**B.     Management Fees Charged To Investors On Overstated Balances.**

The materials obtained by the Receiver to date suggest that at least one Receivership Entity may have charged management or advisory fees to investors based on overstated balances, thereby collecting excess fees. Specifically, the Altus Capital Opportunity Fund ("ACOF") (a Receivership Entity on the basis of its common control by and affiliation with Total Wealth and Altus Capital Management, LLC and their principals), charged investors advisory fees of 1.4% of its investors' closing monthly balances. However, the manner in which these balances were calculated led to the overstatement of the balances, and thus to the collection of excess fees. ACOF calculated closing investor balances after earnings/loss and accrued interest were applied to the balances, but before the allocation of operating expenses, thereby potentially overstating the balances. Likewise, ACOF treated pending redemptions, and other receivables that had not yet been realized, as cash on-hand for balance calculation purposes, again resulting in the overstatement of balances that investors understood to be essentially liquid.

LAW OFFICES
atkins Leck Gamble

## C.    Investments In PPCN.

As noted above, the records relevant to the Altus Funds obtained to date report that they hold investments valued in excess of $30 million in PPCN, memorialized by notes issued in the name of various Altus Funds and ultimately held for the benefit of investors.[6]

According to Mr. Hartman, PPCN holds two principal investments:  an undisclosed portion of the Melrose on the Beach resort (the "Resort"), a distressed golf resort on Daufuskie Island, off the coast of South Carolina, and Good Earth Minerals LLC ("GEM"), a start-up mining enterprise planning on exploiting calcium sulfate mines in Utah.  The total equity investment in the Resort is approximately $30 million, with approximately $3,000,000 invested in GEM.  The Receiver understands that the Resort requires substantial repair and improvement; indeed, Mr. Hartman is seeking to refinance it in order to secure additional funds.  Likewise, GEM has only begun building its infrastructure and the Resort refinance will also apparently fund improvements required at the mine.  To the Receiver's knowledge, no mining has actually taken place.  Mr. Hartman has represented that PPCN has little in the way of operating cash to undertake its activities, much less make distributions to investors.

Nonetheless, and consistently from the inception of the PPCN investments through most of 2014[7], the PPCN notes paid 12.5% interest on a semi-annual basis, including via substantial cash payments, with the balances allegedly reinvested in PPCN.  This fact, particularly when paired with Mr. Hartman's suggestion that PPCN was cash-poor, raises a significant question.  Specifically, and assuming that PPCN indeed had limited funds available, how was PPCN able to make such substantial interest payments (including in cash)?  The records obtained to date by

---

[6]  Again, Mr. Hartman has claimed that these notes are unsecured.  The Receiver has not recovered any records confirming that PPCN holds $30 million or more in assets.

[7]  The last large-scale distributions occurred in 2013.

the Receiver do not provide an answer. The nature of PPCN's holdings, which do not appear to generate cash flow and required additional infusions, the fact that no significant cash distributions have been made since July 2013, and the potentially phantom nature of purportedly reinvested, non-cash distributions, suggests that the prospects for recovery are highly uncertain.

In addition to the Altus Funds investments in PPCN, Total Wealth and PPCN (and Pinnacle and DFG, Mr. Hartman's other entity) appear to have entered into parallel management and/or fee sharing arrangements. In 2009, Pinnacle contracted with DFG to provide a series of vaguely defined, "consulting" services, for a monthly payment of $36,000. This agreement may be the source of the DFG payments to Pinnacle addressed above, although those payments are specifically identified in the Receiver's records as "solicitor fee revenue," not consulting fees.

Likewise, in 2010, Total Wealth appears to have contracted with PPCN to serve as its fund manager, suggesting that Total Wealth may have exerted some direct control over the Altus Funds investments, begging the question of why Total Wealth did not ensure that sufficient security for the PPCN notes was granted to the Altus Funds, assuming Mr. Hartman's claim that the notes are unsecured is accurate. While the Receiver has not yet fully ascertained the scope and nature of the relationship between Total Wealth, Pinnacle, and the Hartman-controlled entities, the degree to which the entities appear to be intertwined is suspect.

### D. Investment Commonality Across Purportedly Diversified Funds.

The Receiver understands that the Receivership Entity investments purported to be tailored to specific investor profiles; that is, that investors' moneys were placed into Receivership Entity investment funds tailored for their particular investment goals or preferences. For example, it would appear that the Altus Income Portfolio Series or other "conservative" investments would have different investment objectives and risk tolerances than, say, the Altus Focused Growth Portfolio series, or other more aggressive investments.

LAW OFFICES
atkins Leck Gamble

1    Despite these apparently different characterizations of investment objectives
2    and risk tolerances, a review of the records obtained to date suggests that the
3    majority of the investments in each fund were actually the same; specifically
4    including PPCN, the Aegis entities, Metro Coffee, FourthDimension Income Fund
5    LP, Bright Star Investment Fund LP, Rainmaker Capital Appreciation Fund LP,
6    Quadriga Secured Opportunity Fund I LP, Auriga  (AUSAF ABS I, LLC), LJL
7    Secured High Yield Income Fund I LLC, Toro Investors I LP, Toro Investors II LP,
8    Amerifunds Secure Income II, and Novus Investments LLC.  Accordingly, the
9    records obtained to date suggest that the investments into which individual investors
10   were placed were not actually "tailored" in the manner represented.

11   **E.    The Metro Coffee Investment.**

12   The records obtained by the Receiver establish that the Receivership Entities,
13   including at least, Altus Capital Management, LLC, directed approximately $3
14   million (not including the nearly $18 million in other Aegis investments written off
15   as bad debt by the Receivership Entities) to Metro Coffee, which purported to be
16   executing on a business plan with its parent company, Aegis Holding Company, Inc.
17   ("Aegis"), to open and operate eight coffee centers (kiosks) in Bay Area Rapid
18   Transit ("BART") stations in the San Francisco area.  At present, the Receiver is
19   informed and believes that, while Altus Capital Management, LLC (either for itself
20   or its investors) was intended to be a secured creditor in Metro Coffee's assets, it did
21   not record a financing statement, potentially leaving the investment unsecured.

22   While Metro Coffee was to own and operate the coffee centers, it was Aegis
23   which obtained and owned the permits for the centers.  In addition to the direct
24   infusion of cash to Metro Coffee via investor funds, Altus Capital Management,
25   LLC made direct loans to Aegis of at least $400,000, secured by the BART permits,
26   which the Receiver understands are due to expire in 2017.

27   Ultimately, Metro Coffee opened only a total of four coffee centers.  Worse,
28   as a consequence of the apparent misapplication of Metro Coffee funds by its

LAW OFFICES
atkins Leck Gamble

1  principal, Metro Coffee was essentially insolvent since its inception.  As a result,

2  Metro Coffee has since defaulted on a number of its obligations, including rent

3  owed to BART in the amount of approximately $500,000, and is now in bankruptcy.

4      Bankruptcy counsel for Metro Coffee has advised the Receiver that an offer

5  to purchase Metro Coffee's assets, as well as the BART permits held by Aegis, has

6  been received.  If approved by the Bankruptcy Court (and assuming the debt owed

7  to BART were forgiven), such a sale could result in a return to the Receivership

8  Entities in the amount of approximately $200,000 - $250,000.  While this amount is

9  a far cry from the aggregate amounts lent and invested, it may be more beneficial for

10 the Receivership Entities to cooperate in a sale rather than to allow Metro Coffee to

11 be placed into a chapter 7 case and liquidated, with no essentially return at all to the

12 Entities.

13      **F.    Operating Expenses Passed On To Investors.**

14      The records recovered by the Receiver suggest that, in years prior to 2014, the

15 Entities' operating expenses were approximately $100,000, a significant portion of

16 which themselves appear not to be true operating expenses but rather unique

17 business expenses, including an audit of the Aegis entities, which cost

18 approximately $70,000, paid between 2013 and 2014.  In any event, the Entities'

19 operating expenses in 2014 were substantially greater, totaling approximately

20 $506,000, or five times the average.  This amount includes at least $300,000 in

21 attorneys' fees incurred in the defense of pending litigation against the Entities and

22 their principals, including Mr. Cooper.  Notably, these fees, characterized as

23 operating expenses, where passed on to investors, who, in essence, at least partially

24 funded the legal defense of the Entities' principals.

25      **G.    Investments Were Subject To Substantial Losses.**

26      Aside from the fee payment and revenue sharing issues identified here, and in

27 the Commission's Complaint, the Receiver is deeply concerned that Total Wealth

28 and the Altus Funds did not invest their clients' funds responsibly.  Current and

LAW OFFICES
atkins Leck Gamble

former investors have experienced significant capital losses to date. While the total extent of the losses prior to the appointment of the Receiver is not yet known, significant losses have already been recognized in connection Aegis Atlantic (over $12 million), Aegis Retail (over $5 million), and Life's Good, Inc., which was determined by the United States District Court for the Eastern District of Pennsylvania to be a Ponzi-like investment scheme and its principal, Robert Stinson, Jr., a recidivist offender, sentenced to 33 years in prison. In addition, for those investors who remain Entity clients, significant losses are expected.

Exhibit 1 appended hereto provides a listing of the known assets of the Altus Funds, together with the number of investors and the cash basis of their contributions, i.e. the money-in/money-out amount of their claims as compared to the current stated value of the purported assets remaining in the Altus Funds. If there is no recovery from the impaired investments, including PPCN, remaining investors' potential, future losses could approach $44 million. The continuation of the receivership in order to mitigate these losses therefore appears to be the appropriate course of action.

## V.   RECEIVER'S CURRENT RECOMMENDATIONS.

While the Receiver's document recovery, review, and analysis efforts are incomplete at this time, the materials she has recovered and reviewed to date, strongly militate in favor of the continuation of the receivership with, at least, the following goals:

### A.   Continue Investigation, Discovery, And Receivership Asset Identification And Recovery Efforts.

As noted above, while the Receiver has recovered a substantial amount of information regarding the business and financial activities of the Receivership Entities, the records recovered to date do not provide a complete accounting of all funds received and expended by the Entities, including investor funds. As such, the Receiver believes that additional investigation and discovery efforts will yield a

LAW OFFICES
atkins Leck Gamble

material benefit to the estate of the Receivership Entities, both in terms of providing a more complete understanding of their business and financial activities and potentially identifying additional recoverable Receivership Assets. The Receiver therefore recommends that the Court allow her to continue her investigation, discovery, and Receivership Asset identification and recovery efforts, including as expressly provided for in the Permanent Appointment Order.

### B.     Undertake A Detailed Investigation Of PPCN.

As detailed above, the Receiver presently believes that over $30 million in investor funds were directed to PPCN. To date, the Receiver has no explanation for this investment. While the Receiver has delivered a turn-over request to PPCN, including a request for documents, and subpoenaed PPCN's bank records, no materials have yet been produced. As such, the nature of the Entities' investment in PPCN and the extent of the security for that investment remain unclear. So too does the manner in which PPCN was able to make substantial interest payments on its notes despite having limited resources. This latter issue is of particular importance because the Receiver's present information suggests that PPCN could not have generated funds sufficient to pay 12.5% semi-annual interest. Likewise, the Receiver has established that PPCN was paying revenue sharing or management fees to Total Wealth and Pinnacle, the source of which is, again, unclear. Accordingly, the Receiver recommends undertaking a dedicated, detailed investigation of the financial activities of PPCN as they relate to the Entities. To the extent the Receiver uncovers information suggesting that the PPCN investments were solicited or obtained through fraud or misrepresentation of any kind, the Receivership Entities may have a claim for rescission and/or disgorgement.

### C.     Perform A Preliminary Forensic Accounting.

Although the materials recovered to date by the Receiver do not provide a complete understanding of the business and financial activities of the Receivership Entities, they appear to contain information sufficient to conduct a preliminary

LAW OFFICES
atkins Leck Gamble

forensic accounting.  Such an accounting would enable the Receiver to better understand the activities of the Entities, identify the entities to which investor funds were directed, and potentially identify parties who received Receivership Assets for no consideration, or without providing reasonable value in exchange.  In other words, a limited forensic accounting would better enable the Receiver to account for the amount and use of investor funds as well as to identify subjects of potential disgorgement actions.

### D.     Submit Further Reports To The Court.

Assuming the Court authorizes the Receiver to undertake the actions recommended herein, as well as to continue those actions provided for in the Permanent Appointment Order, the Receiver proposes submitting Interim Reports to this Court addressing her progress, findings, conclusions, and further recommendations, approximately every 90 to 120 days.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

LAW OFFICES
atkins Leck Gamble

# VI.    PETITION FOR FURTHER INSTRUCTIONS.

Accordingly, the Receiver respectfully requests that the Court enter an order:

1.    Accepting the Receiver's Report;

2.    Authorizing the Receiver to continue to administer the Receivership Entities in accordance with the terms of the Permanent Appointment Order;

3.    Authorizing the Receiver to undertake the recommendations presented herein; and

4.    Providing such other and further relief as the Court deems necessary and appropriate.

Dated:  March 12, 2015
ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
DAVID R. ZARO
JOSHUA A. DEL CASTILLO
KENYON HARBISON

By:    _/s/    Joshua A. del Castillo_
   JOSHUA A. DEL CASTILLO
   Attorneys for Receiver
   KRISTEN A. JANULEWICZ

1010627.04/LA

LAW OFFICES
atkins Leck Gamble

# **VERIFICATION**

I have read the foregoing INITIAL REPORT AND RECOMMENDATIONS AND PETITION FOR INSTRUCTIONS OF RECEIVER, BY KRISTEN A. JANULEWICZ, and know its contents.

I am the Receiver appointed in this action. The matters stated in the foregoing document are true, to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 12, 2015 in Irvine, California.

KRISTEN A. JANULEWICZ

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

1010627.04/LA

Case No. 15-cv-226 BAS (DHB)