Jessica G. Peterson, CA Bar No. 282743
**DURHAM JONES & PINEGAR, P.C.**
111 East Broadway, Suite 900
P O Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000
Facsimile:   (801) 415-3500
Email: jpeterson@djplaw.com

Attorney for JACOB KEITH COOPER

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TOTAL WEALTH MANAGEMENT, INC., et al.,<br><br>Defendant. | Case No. 15cv226-BAS (DHB)<br><br>**DEFENDANT JACOB K. COOPER'S MOTION TO SELL PERSONAL ASSETS AND TO ESCROW PROCEEDS**<br><br>Date:   April 4, 2016<br>Judge: Hon. Cynthia Bashant<br>Place:  221 West Broadway<br>          San Diego, CA 92101<br>          Courtroom 4B<br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT**<br><br>Magistrate David H. Bartick |

Defendant Jacob K. Cooper ("Cooper"), by and through his counsel of record, hereby moves the Court for entry of an Order lifting the receivership stay to allow him sell personal assets and to escrow any proceeds pending a further determination of potential claims to the assets or the proceeds of the sale ("Motion").

## FACTS

1. The United States Securities & Exchange Commission ("SEC") commenced these proceedings against Cooper and Total Wealth Management, Inc.,

Altus Capital Management, LLC, and all of their related entities (collectively, "Total Wealth") and on February 4, 2015. Dkt. 1.

2. The SEC obtained a Temporary Restraining Order ("TRO") the same day, Dkt. 4, and converted the TRO into a Preliminary Injunction ("PI") (collectively, "Freeze Orders") on February 12, 2015, Dkt. 8.

3. The Freeze Orders resulted in the appointment of a receiver, Kristen A. Janulewicz ("Receiver").

4. The Freeze Orders specifically enjoined Cooper from:

> directly or indirectly, transferring, assigning, selling, hypothecating, changing, wasting, dissipating, converting, concealing, encumbering, or otherwise disposing of, in any manner, any funds, assets, securities, claims or other real or personal property, including any notes or deeds of trust or other interest in real property, wherever located, of any one of the Defendants [Cooper and Total Wealth], or their subsidiaries or affiliates, owned by, controlled by, managed by or in the possession or custody of any of them and from transferring, encumbering dissipating, incurring charges or cash advances on any debit or credit card of the credit arrangement of any one of the Defendants [Cooper and Total Wealth], or their subsidiaries and affiliates. Dkt. 8, at 4.

5. The Freeze Orders also froze the assets of Cooper and Total Wealth. Dkt. 8, at 5-6 (listing thirty-three bank accounts, both personal and related to Total Wealth); Declaration of Jacob Cooper ("Cooper Dec."), ¶¶ 4, 6, filed concurrently herewith.

6. Cooper did not receive an allowance for necessary and reasonable living expenses in the PI and has, to date, not moved the Court for approval of them. As a result, his source of income was halted, and he has relied upon the support of family members since the beginning of these proceedings. Cooper Dec., ¶¶ 4-5.

7. When the Court entered the Freeze Orders, Cooper owned a condo at 2322 Caminito Andada, San Diego, California ("Condo") and a 2004 Monterey 228 si boat ("Boat") (collectively, "Assets"). Both the Condo and Boat were financed, and Cooper continues to make the monthly payments to the lenders and, with regard to the Condo, continues to pay the homeowners association dues and some utilities. Cooper Dec., ¶ 7.

8. The Condo was purchased before the creation of Total Wealth Management and was not purchased with funds earned from Total Wealth Management. Cooper's wife, who owns the Condo jointly, was working at the time and earning income. Cooper Dec., ¶ 8. Additionally, Cooper's wife is the only signatory to loan secured by the Condo. *Id.*

9. The Receiver has indicated in conversation to counsel for Cooper that the Assets are not assets of the receivership.

10. The monthly loan payment on the Boat is $433.83, and the monthly costs to maintain the Condo are approximately $3,726.39, which costs are itemized as follows:

| | |
|---|---|
| Condo Loan No. 1: | $2,710.89 |
| Condo Loan No. 2: | $ 647.50 |
| HOA Dues: | $ 353.00 |
| Waste Removal: | $ 15.00 |
| TOTAL | $3,726.39 |

Attached hereto as **Exhibit A** are copies of recent statements and invoices showing the expenditures. Cooper Dec., ¶ 9.

11. Cooper believes there is very little equity in either the Condo. The San Diego Treasurer valued the Condo at $465,000.00 for the tax year ending on June 30, 2016. Cooper searched for the property at http://www.zillow.com, which values the property at $565,644.00 as of approximately February 1, 2016.[1] Cooper estimates the Condo can be sold for $535,000.00 in the current market. Ex. B (tax assessor's value and zillow.com printout); Cooper Dec., ¶ 10.

12. As of approximately December 31, 2015, the balance on the first mortgage is $409,464.87, and the balance on the second mortgage is $97,720.39. Ex. A; Cooper Dec., ¶ 11.

---

[1] http://www.zillow.com/homedetails/2322-Caminito-Andada-San-Diego-CA-92107/16966059_zpid/

DURHAM JONES & PINEGAR, P.C.
111 E. Broadway, Suite 900
Salt Lake City, Utah 84111 (801) 415-3000

13. Therefore, the equity in the Condo is -$42,128.26, if the San Diego Treasurer's valuation is correct; $58,485.74, if Zillow's valuation is correct; and $27,814.74, if Cooper's valuation is correct. Ex. B. The estimated equity under each scenario does not take into consideration real estate commissions and other transactional costs necessary to sell the Condo. For example, at 6%, real estate commissions alone would total approximately $28,000.00 to $34,000.00. Cooper Dec., ¶ 12.

14. Attached hereto as **Exhibit B** is a demonstrative table showing the three estimated sale prices, the current balances of the loans on the Condo, and the potential equity in the Condo based upon the three valuations (excluding closing costs). **Exhibit B** also includes copies of the property tax statement for June 30, 2016, from the San Diego Treasurer, which shows the treasurer's valuation, and a printout of the zillow.com valuation. **Exhibit A** includes copies of recent mortgage statements from the holders of the first and second mortgages on the Condo, which statements show the balance of those mortgages. Cooper Dec., ¶ 13.

15. Cooper also believes there is very little equity in the Boat. The blue book value according the NADA is $16,020.00.[2] As of approximately November 30, 2015, the balance of the loan on the Boat is $14,343.07. Ex. C; Cooper Dec., ¶ 14. Therefore, the equity in the Boat is approximately $1,676.93, if the NADA valuation is correct. Ex. B; Cooper Dec., ¶ 15.

16. The demonstrative table attached as **Exhibit B** includes a section showing the estimated value of the Boat according to NADA, the amount owed on the Boat, and the estimated equity in the Boat. **Exhibit C** to the Motion includes copies of a recent loan statement from the Navy Federal Credit Union, the lender, and a printout of the NADA valuation. Cooper Dec., ¶ 16.

17. It is Cooper's belief that the Condo and Boat are not the property of Total Wealth and not part of the estate controlled by the Receiver. Additionally, Cooper

---

[2] http://www.nadaguides.com/Boats/2004/Monterey-Boats/228-SI-MONTURA-BR/10216973/values

believes the Assets were not purchased with the alleged ill-gotten income. Cooper Dec., ¶ 17.

18. The Freeze Orders have caused Cooper severe financial hardship because it, first, cutoff his income and, second, requires that he continue to pay the amounts described above to preserve assets. Cooper Dec., ¶ 18.

19. Cooper request leave to sell the Condo and Boat in order to reduce his monthly expenses. In order accommodate concerns the Receiver or the SEC may raise, Cooper agrees to sell the Assets according to the following procedures:

    A. Regarding the Condo, Cooper will hire Cindy Wing of Pacific Sotheby's International Realty (www.cindywing.com) as the listing agent for the Condo.

    B. Cooper will sign the listing agreement and related documents ("Listing Agreement") attached hereto as **Exhibit D**. The Listing Agreement provides that the Condo will be listed on the multiple listing service and will, therefore, be marketed to the public so as to bring the highest possible sale price. The terms of the included residential listing agreement approved by the California Association of Realtors provide additional assurance the highest price will be obtained.

    C. Cooper agrees to use a third-party escrow company selected by Cindy Wing and agrees that all profits from the sale (e.g., after paying all lenders and customary closing costs) will be directed to the Receiver or the Receiver's counsel.

    D. Regarding the Boat, Cooper agrees to market and sell the Boat because it is located in the St. George, Utah area, where he resides.

    E. Cooper will market the boat on craigslist.com, ksl.com classifieds and other outlets at his discretion.

    F. Cooper also agrees to keep a log of parties who contact him expressing interest in the Boat. The log will consist of the contact information of

the individual(s) who contact him, if available.  However, Cooper will not be required to gather more information from those who contact him than that which is volunteered, except that he will obtain the name, address and telephone number of the buyer.

  G. Assuming Cooper finds a buyer, Cooper's attorneys will act as informal escrow agents to the extent necessary to ensure that the sale proceeds are not received by Cooper and that profits of the sale (e.g., after paying all lenders, other expenses, taxes, etc.) are sent to the Receiver or the Receiver's counsel.

  H. The Receiver or the Receiver's counsel will hold the profits until otherwise ordered by the Court.  Any party to these proceedings that claims an interest in the sale profits may petition the Court by motion to have the Court determine the final disposition of the sale profits, e.g. whether the profits are property of the Receivership, whether the profits should be forfeited to pay damages, etc.  At the conclusion of the case, if the profits have not been distributed by the Receiver, then the Receiver will pay the sale proceeds to Cooper.

20. Cooper is also amenable to other reasonable sale procedures to accommodate legitimate concerns raised by the Receiver and SEC.

## ARGUMENT

The Freeze Orders placed a severe financial strain on Cooper.  They deprived him of income, and he has had to rely on the support of his family since the commencement of these proceedings.  In addition to cutting off his income, the Freeze Orders prevent Cooper from disposing of any personal or real property.  This compounds his financial hardship because it requires him to spend considerable funds to preserve the Assets, which have little economic value to him, the Receiver or potential claimants to his assets.  Presently, he must pay over $4,000.00 each month to maintain the debt and other payments on the Condo and Boat.  Accordingly, good cause exists to lift the stay in the Freeze Orders to allow Cooper to sell the Assets and escrow any proceeds.

In this jurisdiction, courts weigh three factors when determining whether to lift a stay:

> (1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim.

*S.E.C. v. Universal Financial*, 760 F.2d 1034, 1038 (9th Cir. 1985) (*citing S.E.C. v. Wencke*, 742 F.2d 1230 (9th Cir.1984)).

These factors weigh in favor of granting the motion. First, allowing Cooper to sell the Assets as proposed preserves the status quo. Although the property will be liquidated, the net sale proceeds of the sales, if any, will be escrowed and preserved. In the alternative, Cooper may not be able to continue to make the $4,000.00 monthly payment to service the debt and maintain the property, which would result in foreclosure by the secured creditors. It is axiomatic that a foreclosure sale will result in a lower return than a non-foreclosure sale. Therefore, the first factor weighs in favor of granting the Motion.

The second factor also weighs in favor of granting the motion. The Receiver has been in place for nearly a year, and she has not taken possession of or attempted to exercise any dominion or control over the Condo and Boat. *See id.* at 1038-39. The Freeze Orders appointing the Receiver instructed her to, *inter alia*:

> A. . . . collect and take custody, control, possession, and charge of all funds, assets, collateral, premises (whether owned, leased, occupied, or otherwise controlled), choses in action, books, records, papers and other real or personal property, wherever located, of or managed by Defendant Total Wealth Management, Inc., and its subsidiaries and affiliates, with full power to sue, foreclose, marshal, collect, receive, and take into possession all such property . . .
>
> . . .
>
> D. . . . take such action as is necessary and appropriate to preserve and take control of and to prevent the dissipation, concealment, or disposition of any assets of or managed by Defendant Total Wealth Management, Inc., and its subsidiaries and affiliates . . . . Dkt. 8, at 9-10

Considering the Receiver's broad powers, one can presume the Receiver does not believe the Condo and Boat are Total Wealth's assets. Cooper's proposal to deposit any proceeds of the sale with the Receiver or her attorneys provides adequate assurances that potential receivership assets (or funds for potential disgorgement) are not dissipated. *See S.E.C. v Private Equity Mgmt. Group, Inc.*, No. CV 09-2901, 2009 WL 2058247, at *2 (C.D. Cal. July 9, 2009) (*citing E.C. v. Dowdell*, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001)). Accordingly, the second factor weighs in favor of granting the Motion.

Finally, the third factor weighs in Cooper's favor. As noted above, the Freeze Orders cut off Cooper's income. He is relying on family members for support, the ongoing monthly $4,000.00 payments places additional burdens on him and his family, and the Condo and Boat have little, if any, equity. Given his financial problems, Cooper should not be required to personally pay expenses that are not necessary and pay for what could be considered luxuries. *See S.E.C. v. Private. Equity Mgmt. Group, Inc.*, No. CV 09-2901, 2009 WL 2058247, at *4 (C.D. Cal. July 9, 2009) (declining to allow release of funds for "lavish lifestyle"); *S.E.C. v. Forte*, 598 F. Supp. 2d 689, 694 (E.D. Pa. 2009) (same). The Condo was also purchased prior to the formation of Total Wealth, and Cooper's wife (and not Cooper) signed the loan secured by Condo. Cooper's wife is not a party to these proceedings and, in the event of default, her credit should be damaged as a consequence. Finally, to the extent the Receiver or SEC object to the Motion and argue that Cooper cannot sell the Assets, the Receiver should be ordered to make the ongoing debt and maintenance fees to keep the Assets that Cooper does not want and are not necessary. Thus, the third element favors granting the motion.

## CONCLUSION

For the foregoing reasons, each of the three *Wencke* factors weighs in favor of Cooper, and the Motion should be granted.

Dated: March 4, 2016.

**DURHAM JONES & PINEGAR, P.C.**

*/s/  Jessica G. Peterson*
Attorney for Jacob Keith Cooper

# PROOF OF SERVICE

Code Civ. Proc. § 1013a(3)

I, Kristin Hughes, hereby declare I am employed in the County of Salt Lake, State of Utah. I am over the age of 18 and not a party to the within action. My business address is Durham Jones & Pinegar, 111 East Broadway, Suite 900, Salt Lake City, UT 84111.

On March 4, 2016, I served the foregoing document described as **MOTION TO SELL PERSONAL ASSETS AND TO ESCROW PROCEEDS** on all interested parties in this action as set forth on the attached service list in the following manner:

____ **BY MAIL:** I am familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Salt Lake City, Utah in the ordinary course of business. I am aware that on motion of the party, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

____ **BY FACSIMILE:** In addition to service by mail as set forth above, a copy of said document(s) was also delivered by facsimile transmission to the addressee(s) pursuant to Code of Civil Procedure §1013(e).

____ **BY OVERNIGHT MAIL:** I caused said document(s) to be picked up by an overnight delivery service company for delivery to the addressee(s) on the next business day.

____ **BY PERSONAL SERVICE:** By causing personal delivery by _____ of the document(s) listed above to the person(s) at the address(es) set forth on the attached service list.

__X__ **(CM/ECF):** I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send electronic notification of such filing to interested parties in this action.

____ (STATE)   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

__X__ (FEDERAL)   I declare that I am employed in the office of the member of the bar of this court at whose direction the service was made.

Executed on March 4, 2016, at Salt Lake City, Utah

*/s/ Kristin Hughes*
Kristin Hughes